belled his reputation as "bad" (412), a judgment joined in by one of the Indian guidance counsellors (Trosper, T. 263). It is not surprising that Laura Hebah (626), her son (583), and daughter-in-law (605) also testified as to Robert Hebah's fear of being beaten and gassed by Moss. The white lawyer who represented Moss summed it up: "he was clothed subtly with a badge and he used this power, like I said, almost in a sadistic fashion" (Sen. Svilar, T. 526).

This is the policeman whose conduct we must evaluate, not some theoretical model of a careful and reasonable officer. There is, understandably, considerable reluctance on the part of courts to reflect adversely on the actions of an officer in making an arrest except where the departure from the norm is egregious. This mirrors a recognition both of the degree of danger policemen face regularly in performing their tasks and of the difficulties of split-second decision-making as to the amount of force that may be necessary. Events of the past decade, however, have forced into the public consciousness the sorry fact that there are some law enforcers who are not careful and reasonable, and do not try in good faith to do their best. I believe that this is one such instance. The record demonstrates that Moss should not have been allowed to remain an officer, and that on this occasion he acted, not as a police officer should, but as his own sadistic feelings prompted.

Since the court agrees with the commissioner that the killing was justified, it does not have to decide whether Moss was a "bad man" within the meaning of the treaty. However, I am sure that, had the commissioner and the court come to my conclusion as to Moss' use of excessive force, they would have no doubt as to the aptness of that characterization. The commissioner, as I have noted, found: "The character testimony as to Norman Moss' general reputation as an officer was, without exception, that it was bad" (finding 22), and I have already set forth the evidence showing his brutality, irresponsibility, and lack of

proper qualities. The record compels the finding that, even before the death of Mr. Hebah, Moss was a "bad man", and the events of that night reinforce the appellation.

I would hold that plaintiff is entitled to recover and return the case to the trial commissioner to ascertain the amount of recovery.

LARAMORE and DURFEE, Senior Judges, join in the foregoing dissenting opinion.

ECONOMY PLUMBING & HEATING CO., Inc., et al.

v.

The UNITED STATES.

No. 226–65.

United States Court of Claims.
March 17, 1972.

A. Charles Lawrence, Chicago, Ill., attorney of record for plaintiff and for Transamerica Insurance Co., third-party plaintiff.

Mark Segal, Washington, D.C., with whom was Asst. Atty. Gen., Scott P. Crampton, for defendant.

Before COWEN, Chief Judge, and DAVIS, COLLINS, SKELTON, NICHOLS, KASHIWA and KUNZIG, Judges.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner Mastin G. White with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on November 15, 1971. On February 3, 1972, a joint motion for judgment under Rule 141(b) was filed by counsel for plaintiff, the intervening or third-party plaintiff (Transamerica Insurance Company) and defendant, wherein it is stated that no intention to except to the commissioner's report is on file, that no party desires to except and that "the parties respectfully request that the Court adopt the Commissioner's findings of fact, opinion, and recommendation for the conclusion of law as the basis for the judgment in this case."

Since the court agrees with the commissioner's opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Therefore, it is concluded that plaintiff and Transamerica Insurance Company, third-party plaintiff, are entitled to recover and judgment is entered for them in the sum of $473,010.86. It is further concluded that the third-party petition of Andrew B. Crummy, receiver for Lieb Bros., Inc., be and the same is dismissed for failure to prosecute the claim set out therein.

## OPINION OF COMMISSIONER

WHITE, Commissioner: This is an action for the recovery of $473,010.86,[1] representing a portion of an equitable adjustment under contract No. DA–11–032–ENG–1232 ("the contract") that was—according to allegations in the petition—wrongfully withheld by the defendant.

It is my opinion that a recovery is warranted.

The contract was entered into as of October 4, 1951. The formal signatories to the contract were the defendant (represented by a contracting officer of the Chicago District, Corps. of Engineers, Department of the Army) and Lieb Bros., Inc. ("Lieb"), a New Jersey corporation (represented by its president).

The contract provided for the construction of additional dormitories, mess halls, and appurtenant outside facilities

---

[1]. The original petition asked for a judgment in the amount of $477,587.66, but the requested findings of fact that were submitted on behalf of the plaintiff and Transamerica Insurance Company, third-party plaintiff, reduced the demand to $473,010.86.

at Scott Air Force Base near Belleville, Illinois. The contractor was to be paid $13,484,275.50 as the original contract price. The work, as reduced by a partial termination order, was completed in the spring of 1953 and was accepted by the Corps of Engineers ("the Corps") as of May 27, 1953.

At the end of September 1955, Lieb filed a petition in bankruptcy under Chapter XI of the Bankruptcy Act. Lieb is now insolvent.

On November 18, 1960, the sum of $477,587.66, out of a total equitable adjustment of $544,848.33 awarded by the contracting officer under the provisions of the contract, was paid by the General Accounting Office to the Internal Revenue Service in order to cover payroll taxes and income taxes, together with interest and penalties thereon, which Lieb allegedly owed the defendant. Of the total tax indebtedness claimed against Lieb, only $4,576.80 involved payroll taxes, together with interest and penalties thereon, that arose out of the performance of the contract. The remainder of $473,010.86 was applied by the Internal Revenue Service in satisfaction of tax obligations on the part of Lieb that were unrelated to the contract.

The present action for the recovery of the $473,010.86 which the Internal Revenue Service applied in satisfaction of Lieb's separate tax obligations that were unrelated to the contract was first instituted by Economy Plumbing & Heating Co., Inc. ("Economy").[2] In its petition, Economy alleged that it was a joint venturer with Lieb in the performance of the contract, that Lieb was insolvent and in receivership, and that Economy, as the solvent joint venturer, was suing on behalf of the joint venture for money to be applied in satisfaction of the debts and obligations of the joint venture. In this connection, the evidence in the record shows that the unpaid principal amounts of the outstanding debts and obligations of the joint venture, relating to the performance of the contract, exceed $2,000,000.

On motions filed by the defendant under former Rule 23(a) (1)—now Rule 41(a) (1)—notices were issued to certain third parties, and they filed petitions as third-party plaintiffs. One of the third-party plaintiffs is Andrew B. Crummy, receiver for Lieb. Although the customary notices were sent to Mr. Crummy, he did not participate in the trial and did not submit any requested findings or brief to the commissioner after the trial. The other third-party plaintiff is Transamerica Insurance Company ("Transamerica"), successor by merger of American Surety Company of New York, which acted as surety on the performance and payment bonds required under the contract.

Economy and Transamerica have been represented by the same counsel throughout the court proceedings, beginning with the filing of Transamerica's petition as a third-party plaintiff.

The propriety of the defendant's action in applying $473,010.86 of the proceeds under the contract in order to satisfy Lieb's separate tax obligations that were unrelated to the contract depends upon whether the $473,010.86 belonged to Lieb. In this connection, Section 6321 of the Internal Revenue Code of 1954, 26 U.S.C. § 6321 provides in part as follows:

> If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount * * * shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, *belonging to such person*. [Emphasis supplied.]

Also, Section 6331(a) of the 1954 Code (26 U.S.C. § 6331(a)) provides in part as follows:

> If any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secre-

2. While the litigation was in progress, Economy's name was changed to Economy Mechanical Industries, Inc.

tary or his delegate to collect such tax * * * by levy upon all property and rights to property * * * *be-longing to such person* * * *. [Emphasis supplied.]

Economy and Transamerica contend that the $473,010.86 in controversy represented a property right "belonging to" the Lieb-Economy joint venture, and not to Lieb alone, whereas the defendant contends that the $473,010.86 represented a property right "belonging to" Lieb alone.

█ It has long been the settled rule "that the interest of each partner in the partnership property is his share in the surplus, after the partnership debts are paid; and that surplus only is liable for the separate debts of such partner." United States v. Hack, 33 U.S. (8 Pet.) 271, 275, 8 L.Ed. 941 (1834). Thus, in a situation where a partner owes an individual tax, the Government's tax lien with respect to partnership property extends only to the interest of the particular partner in the surplus of the partnership property. United States v. Kaufman, 267 U.S. 408, 414, 45 S.Ct. 322, 69 L.Ed. 685 (1925).

Economy and Lieb were, in actuality, partners with respect to the performance of the contract, although only Lieb signed the contract as a formal party to it. Economy became involved with Lieb in the undertaking soon after the Corps issued its invitation for bids on the contract. On the basis of its extensive contracting experience in the Illinois area, Economy rendered assistance along various lines in connection with the preparation of a bid to be submitted by Lieb, e. g., labor relations, negotiations with prospective subcontractors, acquisition of payment and performance bonds, and obtaining the necessary financial backing. Then, after bids had been submitted, and while the Corps was negotiating with Lieb and other bidders, Lieb and Economy agreed that they would perform the contract as joint venturers if Lieb was successful in obtaining the job.

After the contracting officer for the Corps informed Lieb that its bid had

been accepted, Lieb and Economy, as previously agreed, executed a written agreement for the performance of the contract as joint venturers. Under the agreement, the project engineer in charge of the work was to be answerable and responsible to both Lieb and Economy, all top-level decisions were to be made jointly by Lieb and Economy, and all checks, vouchers, notes, and other instruments were to be countersigned by both Lieb and Economy. The net profits or losses, as the case might be, resulting from the performance of the contract were to be shared by Lieb and Economy on a 65–35 basis.

The contract was performed by Lieb and Economy as joint venturers. They participated together in all phases of such performance: financing, management, selection of personnel, selection of and dealings with subcontractors, dealings with the Corps, and dealings with labor unions.

Furthermore, at about the time when the contracting officer informed Lieb that its bid on the contract was accepted, Lieb and Economy notified the Corps that the contract was to be performed by Lieb and Economy as a joint venture, with Lieb having a 65 percent interest and Economy having a 35 percent interest in the job. Thus, the Corps was fully aware throughout the performance of the contract that the work was being done by Lieb and Economy as a joint venture.

The circumstance that Economy was not a formal signatory to the contract is not controlling with respect to the disposition of the present case. In this connection, the case of Stuart v. Willis, 244 F.2d 925 (9th Cir., 1957), is especially significant. In that case, John E. and Edith P. Willis entered into a joint venture with King-Hoover Construction Company ("King-Hoover"), a corporation. King-Hoover was in a preferred position to obtain a certain construction contract with the Government, and the corporation did bid on and obtain the contract in its name. Later, when the job was successfully completed by the

joint venture, the Government owed $12,278.18 on the job.

King-Hoover was indebted to the Government for payroll taxes, and the entire amount of $12,278.18 mentioned in the preceding paragraph was applied by the Government in satisfaction of King-Hoover's tax obligations. The tax indebtedness in connection with the joint venture's project amounted only to $3,610.95. Thus, the sum of $8,667.23, out of the $12,278.18 due on the construction contract, was applied by the Government in satisfaction of King-Hoover's taxes that were unrelated to the joint venture's project. The joint venture filed suit for the recovery of the amount that had been applied to the payment of King-Hoover's separate tax obligations.

In holding that the joint venture was entitled to recover, the court stated in part as follows (244 F.2d at p. 929):

> There is no statute which permits the Collector to effect a tax liability to the United States against payments due on such a job to King-Hoover from the United States, even though the contract is in the name of King-Hoover alone. He is required to proceed by levy against the property of a taxpayer. There is no statute which permits the Collector to levy upon the property of a partnership for the outside liabilities of the partner. Since the Collector levied upon the property of the taxpayers, Willis and King-Hoover, to liquidate a tax liability of King-Hoover alone, the levy was void.

In the present case, therefore, the equitable adjustment in the amount of $544,848.33 which the contracting officer awarded under the provisions of the contract was a property right "belonging to" the Lieb-Economy joint venture that performed the contract. As the unpaid debts and obligations of the joint venture greatly exceeded the amount of the equitable adjustment, the equitable adjustment did not include any surplus that could be allocated between Lieb and Economy as their respective individual shares. Consequently, no part of the equitable adjustment was available for application in satisfaction of separate tax obligations on the part of Lieb that were unrelated to the contract.

It necessarily follows that the defendant acted without lawful authority when it applied a portion—i. e., $473,010.86—of the equitable adjustment in satisfaction of Lieb's separate obligations that were unrelated to the contract. Economy and Transamerica are entitled to recover the $473,010.86 in order that this money may be available for the payment of the joint venture's outstanding debts and obligations, at least in part.

The third-party petition of Andrew B. Crummy, receiver for Lieb, should be dismissed because of his failure to prosecute the claim asserted in such petition.

**GLOBAL VAN LINES, INC.**

v.

**The UNITED STATES.**

Nos. 259-65, 355-65.

United States Court of Claims.
March 17, 1972.

