CENTRON CORPORATION

v.

The UNITED STATES.

No. 266–76.

United States Court of Claims.

Oct. 18, 1978.

a contractor, Elegant Garments, Inc. (Elegant), amounts that SBA otherwise was obligated to pay to Elegant. The plaintiff, Centron Corporation (Centron), contends that it was entitled to 85 percent of the amount due from SBA to Elegant and that SBA, therefore, had no right to offset that 85 percent against Elegant's indebtedness to SBA.

The case is before us on cross-motions for summary judgment. After hearing oral argument, we conclude that the plaintiff is not entitled to recover. We therefore deny the plaintiff's motion for summary judgment and grant that of the defendant.

## I.

The United States has a program under which certain portions of government procurement contracts are set aside for minority contractors. See generally SBA, 8(a) Business Development Program (1976); SBA, Section 8(a) Program Standard Operating Procedure (1976). Such procurement is accomplished by the contracting agency hiring the SBA as the prime contractor; the latter then subcontracts with the minority contractor to perform the contract. The SBA frequently lends money and provides other assistance to the subcontractor to help it in performing the contract; sometimes it pays the subcontractor a higher price than that under its prime contract with the procuring agency. See 15 U.S.C. §§ 636(b), 636(a), 637(a) (1976). The procuring agency makes payments under the contract to SBA, which remits the payments to the subcontractor after deducting any amounts SBA has advanced to it.

That procedure was followed in this case. In September 1968, the United States Army Procurement Supply Agency (Supply Agency) entered into a contract with SBA under which, pursuant to SBA's Minority Set-Aside Program, SBA was to supply bandoleers for 40 mm. cartridges. Shortly before, SBA had entered into a subcontract with Elegant, an ethnic minority-owned corporation, to perform the prime contract.[1]

Oscar Spitz, Corpus Christi, Tex., for plaintiff. Spitz & Grossman, Corpus Christi, Tex., of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington D. C., for defendant.

Before FRIEDMAN, Chief Judge, SKELTON, Senior Judge, and KASHIWA, Judge.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

FRIEDMAN, Chief Judge:

The question in this case is whether the Small Business Administration (SBA) validly offset, against an indebtedness to it from

---

1. Both the prime contract between the Supply Agency and SBA and the subcontract between SBA and Elegant were subsequently modified to increase the number of bandoleers to be supplied.

Armed Services Procurement Regulations (ASPR) 1–1701, 1702 (1969) provide that all contracts for $100,000 or more shall include a Value Engineering Incentive Clause, under which a contractor shares in any cost reductions that result from his suggestion. The contractor receives payments covering all contracts for which the suggestion produces savings, including those with other contractors.

In August 1969 the Supply Agency solicited bids for another contract to supply 40 mm. bandoleers. Centron submitted a bid and, believing that it would be the successful bidder, also submitted a Value Engineering Change Proposal (Change Proposal) as the procurement regulation contemplated. It suggested that uncapped snap fasteners be used instead of the capped fasteners that the Supply Agency had specified for the additional bandoleers, and it stated that this change would produce substantial savings in the cost of the bandoleers.

The contract for the additional bandoleers, however, was awarded to Elegant (again through the SBA) which, under ASPR 1–1701, was the only person who could submit a Change Proposal. On September 24, 1969, following the award of the contract to Elegant, Centron and Elegant entered into a contract under which:

(1) Elegant agreed to submit to the Supply Agency a Change Proposal "using all of the technical data and specifications furnished to it by CENTRON . . .", and Centron agreed to furnish to Elegant "all necessary documents, drawings, specifications and other necessary instruments required to submit" the Change Proposal to the Supply Agency.

(2) In consideration of the "[a]ssignment" of the Change Proposal, Elegant agreed "to pay to CENTRON Eighty-five Per Cent (85%) of all funds realized therefrom immediately upon receipt of such funds from the United States of America."

(3) Centron and Elegant agreed that "some form of joint escrow arrangement will be set up to the end that moneys to be received from the United States of America on the Value Engineering Change Proposal" would be paid 85 percent to Centron and 15 percent to Elegant. Centron agreed to pay "all expenses incurred in the processing" of the Change Proposal.

Centron assigned the Change Proposal to Elegant, and Elegant submitted it to the Supply Agency. The latter accepted the proposal and agreed to pay Elegant a stipulated percentage of the savings. Centron sent copies of all pertinent documents relating to the agreement between itself and Elegant to SBA "as a Notice of Assignment from Elegant Garments Incorporated to Centron Corporation of 85% of all funds to be received from the United States of America" on the Change Proposal and as "a formal request that 85% of the monies paid by the United States on account of" the Change Proposal "be paid directly to" Centron. SBA replied that it would not do so, since it was not a party to the contract between Centron and Elegant, and "the matter is a private dispute between the parties and SBA presently has no authority to escrow funds or suspend payment of funds to Elegant Garments."

Elegant failed to pay Centron 85 percent of the amounts it received from SBA under the Change Proposal or to establish the escrow agreement under the contract. Centron then brought suit in the United States District Court for the Northern District of Illinois against Elegant, various individuals, and SBA. *Centron Corp. v. Elegant Garments, Inc.*, No. 70C 1919. The suit was settled in August 1970 on the basis of a stipulation entered into by all of the parties "except the SMALL BUSINESS ADMINISTRATION," which the court adopted as its findings and judgment.

The stipulation stated that Centron was entitled to receive 85 percent and Elegant 15 percent "of all moneys realized or to be received by ELEGANT GARMENTS, INC., from the UNITED STATES OF AMERICA and from SMALL BUSINESS ADMINIS-

TRATION" relating to the Change Proposal. It provided for the establishment of an escrow agreement under which Elegant was to instruct SBA to make all payments arising out of the Change Proposal to the escrowee, and the latter was to pay 85 percent of those amounts to Centron and 15 percent to Elegant. The escrow was established, and copies of the court judgment providing for the escrow and various papers relating thereto were furnished to SBA. In 1970 and 1971 SBA paid the escrowee $69,045.51, which it had received from the Supply Agency under the Change Proposal, and the escrowee in turn remitted 85 percent of that amount to Centron and 15 percent to Elegant.

In 1972 the Supply Agency paid additional amounts to SBA under the Change Proposal that covered other contracts for the procurement of bandoleers. SBA, however, did not remit these moneys either to the escrowee or to Elegant. Instead, it offset them against an indebtedness to it of $40,000, reflected in an overdue promissory note, that Elegant had incurred in connection with another procurement contract, for which SBA had provided financial assistance. The Supply Agency, SBA, and Elegant also settled another claim for moneys under the Change Proposal for $4,000, which SBA paid to Elegant.

Centron contends that SBA was entitled to offset only 15 percent of the amounts it received from the Supply Agency under the Change Proposal and that it could not offset the remaining 85 percent against Elegant's indebtedness to it that arose out of a different transaction because Centron rather than Elegant had the right to receive those moneys.

## II.

■ "The government has the same right 'which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him.' " *United States v. Munsey Trust Co.*, 332 U.S. 234, 239, 67 S.Ct. 1599, 1602, 91 L.Ed. 2022 (1947); *Project Map, Inc. v. United States*, 486 F.2d 1375, 203

Ct.Cl. 52 (1973); *Trinity Universal Ins. Co. v. United States*, 382 F.2d 317, 320 (5th Cir. 1967), *cert. denied*, 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 873 (1968); 28 U.S.C. §§ 1503, 2508, 31 U.S.C. § 227 (1970). The "established right of set-off" permits the government "to set-off against progress payments . . . a federal claim on another contract (with the same contractor) which is believed in good faith, but mistakenly, to be valid." *William Green Constr. Co. v. United States*, 477 F.2d 930, 936, 201 Ct.Cl. 616, 625 (1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974).

■ Under this principle, if Elegant without participation by Centron had developed and submitted the Change Proposal, SBA unquestionably could have offset against Elegant's indebtedness to it under another contract any amounts it owed Elegant under the Change Proposal. Indeed, Centron recognizes this by its concession that SBA properly offset against Elegant's indebtedness to SBA 15 percent of the amounts SBA received under the Change Proposal. The question is whether the fact that Elegant agreed to pay Centron 85 percent of the amounts it received from the United States under the Change Proposal barred SBA from offsetting these amounts against Elegant's indebtedness to it. We answer that question negatively.

A. Centron was not a party to any contract with the United States or its agencies. The agreement covering the Change Proposal was solely between Elegant and the government and was a part of, and dependent upon, the subcontract between those two parties. Indeed, under the Armed Services Procurement Regulation only a party to an existing contract with the government could submit a compensable Change Proposal. *See Grismac Corp. v. United States*, 556 F.2d 494, 214 Ct.Cl. 39 (1977).

Since there was no privity of contract between Centron and the government, Centron cannot recover from the government under its contract with Elegant. *Housing Corp. of America v. United States*, 468 F.2d 922, 199 Ct.Cl. 705 (1972); *United Housing*

*Corp. v. United States,* Ct.Cl., 578 F.2d 1390 (1978).[2] The government agreed to make payments reflecting its savings under the Change Proposal only to its contractor, Elegant, and SBA rejected Centron's request that it pay 85 percent of those amounts directly to Centron. The fact that Centron informed SBA of its contractual arrangements with Elegant did not create a relationship of privity between Centron and SBA, or give Centron any rights against SBA as a result of Elegant's possible breach of its agreement with Centron.

In short, Centron's agreement with Elegant gave Centron no rights against the United States. Elegant did not assign to Centron any of the amounts it might receive under the Change Proposal. In its contract with Centron, Elegant merely agreed "to pay to CENTRON Eighty-five Per Cent (85%) of all funds realized [under the Change Proposal] immediately upon receipt of such funds from the United States of America."[3] This agreement was no different from an ordinary commercial contract under which one party agrees to make certain payments to another in return for services. If Elegant breached its agreement to pay Centron 85 percent of its receipts under the Change Proposal, Centron's remedy was to sue Elegant for breach of contract—as Centron did. Moreover, even if Centron's contract with Elegant were

viewed as an assignment by Elegant to Centron of 85 percent of the amounts Elegant was entitled to receive under the Change Proposal, that did not entitle Centron to sue the United States for those amounts. Finally, the government's acceptance of the Change Proposal and its awareness of the agreement between Centron and Elegant that the latter would pay to the former 85 percent of the amounts it would receive under the proposal did not create an implied contract by the government to pay the 85 percent directly to Centron. *Cf. Grismac Corp., supra.*

Centron attempts to avoid this reasoning by characterizing the arrangement between itself and Elegant regarding the submission of the Change Proposal to the government and the payment by Elegant to it of 85 percent of the amounts to be received as a joint venture. The argument apparently is that because Centron and Elegant were jointly involved in the project, each had an independent and separate right to receive directly from the United States its share of the amounts due under the Change Proposal.

■ But however Centron may describe the agreement, there was no joint venture between Centron and Elegant with which the United States dealt.[4] The government

---

**2.** For similar reasons, Centron cannot challenge, as against the United States, the settlement among the Supply Agency, SBA and Elegant of another claim by Elegant under the Change Proposal, by which SBA paid Elegant $4,000 (see *supra,* p. 985).

**3.** One reason the agreement took that form may have been the questionable validity under the Assignment of Claims Act of 1940, 31 U.S.C. § 203, 41 U.S.C. § 15 (1970), of any assignment from Elegant to Centron of the amounts payable under the Change Proposal. That Act generally invalidates the assignment of claims against the United States except for assignments to financial institutions of proceeds to be earned under government contracts or assignments of claims where the amounts due have been ascertained and warrants for payment have been issued. *Hager v. Swayne,* 149 U.S. 242, 247, 13 S.Ct. 841, 37 L.Ed. 719 (1893); *Produce Factors Corp. v. United States,* 467 F.2d 1343, 1347–1348, 199 Ct.Cl. 572, 579–580 (1972). The Act, however, does not invali-

date any contractual rights or equities as between the private parties to an assignment that does not satisfy the Act. *Segal v. Rochelle,* 382 U.S. 375, 384, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966); *Martin v. National Surety Co.,* 300 U.S. 588, 596–597, 57 S.Ct. 531, 81 L.Ed. 822 (1937); *United Pac. Ins. Co. v. United States,* 358 F.2d 966, 969, 175 Ct.Cl. 118, 125 (1966).

**4.** *Economy Plumbing & Heating Co. v. United States,* 456 F.2d 713, 197 Ct.Cl. 839 (1972), upon which plaintiff relies, involved a different situation. There Lieb Bros., Inc. (Lieb) entered into a contract with the United States for construction work; the preparation of the contract and its actual performance, however, were a joint endeavor of Lieb and Economy Plumbing & Heating Co. (Economy). Prior to the award of the contract to Lieb, Economy and Lieb agreed that if Lieb received the contract, Economy and Lieb would perform it as a joint venture. Economy and Lieb did so, and both of them jointly prepared and submitted a termination claim following completion of the contract.

received the proposal solely from Elegant, and undertook to pay a portion of the savings thereunder only to that firm. The fact that for a time the United States made the payments to the escrowee rather than to Elegant was merely an accommodation to the latter. The United States had no legal obligation to continue making such payments once Elegant became indebted to it under other contracts.

B. Centron also argues that its entitlement to 85 percent of the amounts due under the Change Proposal was established by the August 1970 consent judgment in its suit against Elegant (see *supra*, p. 984); that that judgment bound SBA because it was a party to the suit; and that the judgment required SBA to pay the 85 percent directly to Centron and barred it from offsetting that amount against Elegant's indebtedness to SBA.

As indicated above, the findings and judgment upon which Centron relies were entered on stipulations. The district court made no independent determination or adjudication of the merits of Centron's claim. Although SBA was named a party defendant in the suit, the stipulation expressly excepted SBA from among the parties who had "entered into the following Stipulations." [5]

At the hearing on entry of the judgment, Centron's counsel stated that "The agreement and stipulations that are incorporated in the judgment order that we want to present to the Court settling the matter have not been agreed to by the Business Administration, Small Business, or the Government, because they don't want to stipulate anything." Counsel for SBA explained that the words " 'except the Small Business Administration' should be inserted therein because we are not agreeing to anything" and counsel for Centron stated that he had no objection to the insertion since "we want to show his presence, but not his participation in the result."

A consent judgment binds only the parties who have consented to it. *See, e. g., Owens v. Voncannon*, 251 N.C. 351, 111 S.E.2d 700 (1959); *Marsh v. Warren*, 126 Colo. 298, 248 P.2d 825 (1952); 49 C.J.S. *Judgments* § 174 b. (1947). Similarly, only those parties who have entered into the stipulation are bound by a judgment based upon it. *Southern Ry. Co. v. United States Fidelity & Guaranty Co.*, 87 F.2d 118 (5th Cir. 1936); 83 C.J.S. *Stipulations* § 14 (1953). The judgment in this case is based upon stipulations executed by the parties "except the Small Business Administration." Although the judgment determined the rights of those other parties *inter sese*, it did not purport to and could not determine any right between those parties and the SBA.

The fact that the SBA was a defendant in the suit did not convert the judgment into an adjudication of any rights as between Centron and the SBA. SBA had not joined in the stipulations upon which the court based its judgment, but was expressly excepted therefrom. In the absence of any factual findings based upon a record, the trial court could make definitive determinations only on the basis of the stipulations, and SBA stipulated nothing. The judg-

Lieb became bankrupt and the Internal Revenue Service asserted tax liens against it relating to other contracts. The General Accounting Office paid the amount awarded under the termination claim to the IRS. Economy then brought suit for that amount, and this court held that Economy was entitled to recover. The theory was that the termination payment "was a property right 'belonging to' the Lieb-Economy joint venture that performed the contract" and that "no part of the [termination payment] was available for application in satisfaction of separate tax obligations on the part of Lieb that were unrelated to the contract." 456 F.2d at 717, 197 Ct.Cl. at 845.

In the present case, in contrast, the Change Proposal was not a joint venture of Centron and Elegant, but an agreement between Elegant and the government. The amounts payable under the proposal were not a "property right 'belonging to'" any joint venture, but were a property right of Elegant.

5. The court's judgment stated that the case was heard "by agreement of the parties hereto, EXCEPT SMALL BUSINESS ADMINISTRATION" and that "said parties, (except the SMALL BUSINESS ADMINISTRATION) entered into the following Stipulations, . . .."

ment determined only the right of the parties who had joined in the stipulation and did not give Centron any legal basis for proceeding against SBA or the United States.

Accordingly, the plaintiff's motion for summary judgment is denied, the defendant's motion for summary judgment is granted, and the petition is dismissed.