**UNITED STATES FIDELITY & GUARANTY COMPANY, Plaintiff,**

v.

**ERNEST CONSTRUCTION COMPANY, Defendant.**

**ERNEST CONSTRUCTION COMPANY, Plaintiff,**

v.

**UNITED STATES FIDELITY & GUARANTY COMPANY, Defendant.**

Nos. 88–1633–Civ–T–99, 88–239–Civ–T–99.

United States District Court, M.D. Florida, Tampa Division.

June 20, 1994.

Harry L. Griffin, Jr., W. Henry Parkman, Atlanta, GA, for Ernest Const.

Ron Yarbrough, Jackson, MS, for USF & G.

## ORDER

SCHLESINGER, District Judge.

This cause is before the Court on cross-motions for summary judgment filed by United States Fidelity & Guaranty (Doc. No. 45) in Case No. 88–1633–Civ–T–99 and by Ernest Construction Company (Doc. No. 48) in Case No. 88–239–Civ–T–99. Also, Ernest filed a Motion to Amend the Complaint and

Counterclaim (Doc. No. 70). Both parties filed responses in opposition to all pending motions. The Court conducted oral argument on the motions; and upon reviewing the affidavits, exhibits, and memoranda, makes the following findings.

## A.

## FACTS

Murray Walter ("Walter") was a general contractor. On December 11, 1978, Walter contracted with the United States to construct Phase I of the Bay Pines, Florida, Veterans Administration Center, a 520–bed Replacement Hospital. Before Walter could begin construction on the hospital, Walter secured a $2.5 million dollar payment bond and a $14 million dollar performance bond as required by the Miller Act. *See* 40 U.S.C. § 270a. Walter purchased these necessary bonds from United States Fidelity and Guaranty Company ("USF & G"), the surety and a party to this litigation.

After securing the necessary bonds, Walter contracted with various materialmen to begin construction of Bay Pines, and formed a subcontract with Ernest Construction Company ("Ernest"). Ernest agreed to perform foundation work, which consisted of furnishing and installing pre-stressed concrete piles. As Ernest began to install the concrete piles, Ernest encountered a problem: the subsurface material in which to drill through and drive piles was significantly more difficult than anticipated. Ernest had encountered a differing site condition, a condition materially different from that which the VA had represented to Walter, and that which Walter subsequently presented to Ernest.

Ernest, although believing that a differing site condition existed, continued to work on the project and sent a letter to Walter on February 13, 1979, requesting additional compensation. Ernest Exhibit 1. After reviewing the letter, Walter conducted an investigation to determine if the complaint was indeed correct. Walter tested a sample of soil taken from test pile No. 18, and that test demonstrated "a change in site conditions beyond a shadow of doubt by identifying the material as 'dolomite' (limestone) with no evidence of phosphate." *Id.* Walter communicated this finding to Mr. William Herndon, a senior resident engineer with the Veterans Administration. Walter again communicated to Herndon the problem encountered by Ernest in a letter dated April 4, 1979, and stated that a final claim would be forwarded once a determination was made.

Upon receiving notice from Walter, the VA requested that a complete claim be filed on or before July 6, 1979. Thus, Ernest and Walter submitted a claims packet to Herndon, which included: (1) Walter's claim estimate (2 pages); (2) Ernest's request for equitable adjustment (108 pages); (3) Southern Earth Sciences, Inc.'s Investigation of Subsurface Conditions and Pile Installation Problems (16 pages); and (4) Ernest's Analysis of Additional Cost Due to Differing Site Conditions (15 pages). Ernest's claim was submitted by Walter on behalf of Ernest and several other subcontractors.[1]

While Ernest's claim was pending, the overall project fell behind. Phase I was scheduled to be completed by February 1980. By May 1980, Walter had fallen three months behind schedule for which it became liable for liquidated damages at the rate of $9,000.00 per day. On May 5, 1980, Walter wrote to James Lawson ("Lawson"), the acting contracting officer, and asserted the changed site condition as the reason for the delay. If the VA were to impose liquidated damages in excess of 15% of the entire contract price in addition to the additional costs already incurred by the differing site condition, Walter contended that the job—and the company—would collapse. Clearly, Walter's demise would have adversely affected the VA as well as the surety USF & G.

---

1. Ordinarily, subcontractors lack standing to sue the government. The government consents to be sued only by those with whom it has privity of contract, which excludes subcontractors. Subcontractors have the option of enforcing their subcontract rights against the prime contractor, or prosecuting a claim against the government "through and in the right" of the prime contractor's contract, with the prime contractor's consent and cooperation. *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed.Cir.1984). Ernest opted for the latter, and filed what is commonly termed a "pass through" claim.

The VA agreed to not withhold liquidated damages prior to reviewing Walter's claim. In a letter dated May 27, 1980, Lawson agreed to refrain from withholding liquidated damages until August 1, 1980, providing USF & G would execute a Supplemental Agreement to the Contract agreeing to pay liquidated damages to the Government. Griffin Affidavit, Exhibit A at 2. If at any time prior to August 1, 1980, Walter's efforts to complete the project slowed, the VA would immediately seek liquidated damages. Thereafter, the VA continued to make progress payments to Walter, including a progress payment for the period ending May 2, 1980, even though the contractor had fallen behind on the project.

The work still was not completed by October 1980, and USF & G became increasingly concerned about the project and its liability. Agent Marty Hanafin contacted USF & G Senior Vice President D.H. Meehan seeking advice about "what direction to take regarding Murray's problems with the owner on this job." Ernest Exhibit 5. USF & G considered the problem and wrote an internal memorandum. In that memorandum, USF & G discussed their potential liability to the VA and *Ernest.* The memorandum described the problem as follows:

> There were bad specifications which did not disclose certain soil conditions which resulted in drilling piles instead of driving them. The result has been for our principal to document a 1.7 million dollar claim against the owner for these changed conditions. Presentation of the claim to the contracting officer has met with little success and in fact the owner may assess liquidated damages against our principal. There is supposed to be 2½ million dollars left to bill in the job. Bottom line is that the whole thing may work out to be a wash. i.e., the owner will forget liquidated damages but continue to pay Murray Walter, Inc. until the job is completed.

> . . . . .

> A meeting between Murray Walter and the VA is scheduled for Friday, October 31, at 10:00 a.m. in Washington, D.C., and the question is whether or not U.S.F. & G. should be represented in this meeting.

Ernest Exhibit 5.

The memorandum summarized the claims filed by Walter and Ernest. It acknowledged that the contractual completion date had passed, and that it appeared the target completion date would now be mid 1981. Equally important, USF & G recognized that liquidated damages assessed against Walter, the principal on the bond, would exceed the amount remaining to be earned on the project. In light of this dilemma, the memorandum discussed alternative courses of action to limit the surety's liability, including *Ernest's* claim, as follows:

> The alternatives would include walking off the job which would be totally unreasonable since this is a Federal contract and must be completed. Both sides have hired experts, done surveys and exchanged information with no resolution of the problem reached as of yet. Mr. Hynes feels that the VA may not have this money available to satisfy the claim. *Another alternative would be to buy out the sub's claim or in effect pay off a sum something under $500,000.00 which M.W.I would not get back.* This would be an immediate drain on cash flow but could be financed through bank credit or other means. Any way you cut it up it appears that the job will go from a $250,000.00 profit at 6–30–80 to a rather substantial loss if this claim is not resolved in some manner.

Ernest Exhibit 5 (emphasis added).

Walter met with a representative from the VA in November 1980, and following that meeting, the parties agreed to execute a rider to the performance bond. The rider as executed provides in relevant part:

> (a) Perform and fulfill all the undertakings, covenants, terms, conditions, and agreements of said contract, including but not limited to *any and all obligations of the Principal with respect to assessment of liquidated damages* as therein provided during the original term of said contract and any extensions thereof that may be granted by the government, with or without notice to the Surety(ies), and during the life of any guaranty required under the

contract, and shall also perform and fulfill all the undertakings, covenants, terms, conditions, and agreements of any and all duly authorized modifications of said contract that may hereafter be made, notice of which modifications to the Surety(ies) being hereby waived;

Griffin Exhibit A (emphasis added).

After the parties negotiated this rider, Walter continued construction on the project. The new completion date was targeted as April 30, 1981, but it appeared in May 1981 to Lefter, contracting officer for the VA, that the project would not be completed on time and that USF & G would become liable for additional liquidated damages. Thus, the VA requested that Walter contact USF & G about the delay and obtain a letter acknowledging the project status and additional delays. USF & G complied with Ernest's request and reaffirmed the amendment to the surety bond. Griffin Exhibit A. Once again, USF & G acknowledged its liability for *"any and all obligations of the Principal with respect to assessment of liquidated damages."*

Walter eventually completed the project on July 29, 1981,[2] a date which the VA determined to be 341 days late. Griffin Exhibit A. The VA estimated that USF & G owed liquidated damages in the amount of $2,455,-000.00. However during this time, the administrative claims filed by Walter and Ernest were still pending. Lefter allowed USF & G to defer payment of $1,908,000.00 from the total amount, but required an immediate payment of $547,000. This payment amount was requested because the funds were unrelated to the pending but still unresolved administrative proceeding.

Walter failed to pay liquidated damages, but instead demanded payment for "punch list" work performed since the last payment request in October 1981. Lefter notified Walter in December 1981 that no additional monies would be disbursed until Walter first paid to the VA $547,000.00 in liquidated damages. Also, Lefter contacted USF & G about Walter's nonpayment. The letter restated USF & G's obligations under the Supplemen-

tal Agreement and insisted that payment be made within 30 days or the VA would withhold payment of funds as a partial payment towards unpaid liquidated damages. According to Lefter's interpretation of the Supplemental Agreement, USF & G agreed to pay liquidated damages at the *completion* of the contract. The contract was completed and neither Walter nor the surety had performed as promised.

In response, USF & G answered in April 1982 with a brief letter confirming that USF & G agreed to pay liquidated damages to the extent that it is liable. Yet USF & G refused to pay until a decision was made concerning the pending claims.

On February 15, 1983, Lefter made a final decision concerning the differing site condition claim. Ernest Exhibit 8. In that decision, Lefter stated that "I find no fault in the presentation of the existing soil conditions in the contract documents, and therefore, I accept no responsibility for your delayed completion." Ernest Exhibit 8 at 6. In addition, Lefter demanded liquidated damages in the entire amount of $2,455,000.00.

Following Lefter's decision, Walter filed a notice of appeal in the matter on March 28, 1983, pursuant to the Contract Disputes Act of 1978. This appeal contained not only Walter's claim against the VA, but also Ernest's differing site condition claim and the claims of other subcontractors. Walter and Ernest jointly filed a complaint on May 12, 1983, against the VA for the differing site expenses and other expenses suffered by Walter and the other subcontractors. The VA filed a counterclaim, seeking $2.4 Million in liquidated damages arising from the construction delay. The cases were set for trial.

On May 9, 1983, Walter and Ernest entered into a liquidated agreement. The agreement provided that Walter acknowledged liability to Ernest for an equitable adjustment, but only in the amount, if any, collected or recovered from the VA—including settlement of the claim. The agreement further outlined the parties' mutual responsibilities for prosecuting an appeal.

---

**2.** The project was accepted by the VA on August 11, 1981.

At the conclusion of the two trials before the Veterans Administration Board of Contract Appeals in December 1985, Ernest's counsel, Harry L. Griffin, Jr., prepared a supplemental agreement to confirm that USF & G would be likewise obligated to Ernest for payment of Ernest's claim. USF & G was not a party to the May 1982 liquidated agreement. Ernest mailed the supplemental agreement on November 26, 1985, to Walter's counsel Leslie Hynes. Griffin Affidavit, Exhibit B at 5. Hynes indicated that the agreement merely confirmed the prior agreements, and suggested that Griffin forward a copy of it to USF & G. Ernest Exhibit 12. Griffin followed his advice and mailed the agreement to Trecker, Assistant Secretary of USF & G's Claims Department.

Following Trecker's receipt of Griffin's letter, USF & G and Ernest had differing opinions concerning the surety's liability to Ernest that were never resolved. Trecker received Ernest's supplemental agreement, and after reviewing it on January 6, 1986, Trecker informed Griffin that he would not execute that agreement. According to Griffin, Trecker acknowledged that although USF & G was not a party to the liquidating agreement, USF & G was bound nevertheless by the agreement. Further, Griffin claims that Trecker never contended that USF & G was subrogated to the VA's rights. The dispute between Ernest and USF & G, according to Griffin, was merely over the *language* contained in the liquidation agreement concerning the phrase "collection or recovery." Trecker allegedly urged that Ernest would be paid only if Walter actually collected monies from the VA. Griffin rejected that interpretation and argued instead that Ernest would be entitled to payment from USF & G should the VA be entitled to a setoff. Griffin Affidavit at 6.

Following the phone conversation, Griffin and Trecker exchanged a series of letters. Griffin wrote Trecker on January 15, 1986, in which he discussed the problem:

> USF & G, through you, indicated that should Ernest prevail in its claim through Walter and obtain a recovery against the Government, then it would be the intent of USF & G to refuse any cooperation with Ernest. You further indicated that USF & G had been assigned all assets of Walter so as to preclude direct payment by Walter in satisfaction of the Ernest claim. Because USF & G is obligated under its performance bond to the Government, then USF & G has ultimate liability to the Government against Walter should the Government prevail on its claim for liquidated damages. You indicated that in the event that should a Board decision find an entitlement of Ernest on its differing site condition, but the Government's offset for liquidated damages be held to be greater than said recovery, then USF & G would recognize no payment obligation to Ernest, even though USF & G's obligation to the Government had been reduced by the exact amount of Ernest's recovery and USF & G had stripped Walter of all assets with which to make independent payment.

Ernest Exhibit 13. Griffin considered such a position to be "unconscionable." While USF & G considered the Liquidating Agreement to be binding "on the part of Walter, and its surety," Griffin understood the agreement to require USF & G to pay should any monies be *recovered.* Presumably, this would include payment to Ernest even if the government exercised a setoff against the contractor. Trecker, on the other hand, considered the agreement binding only if the VA affirmatively and actually paid monies to Walter.

On January 23, 1986, Trecker responded to Griffin's letter. Trecker outlined USF & G's position as follows:

> USF & G refused to execute this Agreement because it was not a party to the original Agreement and because the document, in our judgment, clearly was *intended to create an affirmative obligation on the part of USF & G to pay in part or in total your client's claim.* Your client's right to make claim against USF & G's labor and material payment bond is governed by Title 40, USC 270, The Miller Act. Our understanding of the Miller Act is that a condition precedent to recovery for any covered claimant is that suit be instituted in the Federal District Court, where the contract is being performed, within one year of the date the claimant

last supplied labor and material for which claim is being made. It would appear that your client last provided labor and material for this project significantly more than one year ago and would, therefore, be barred from making any recovery against USF & G's labor and material payment bond.

Ernest Exhibit 14 (emphasis added). Moreover, Trecker concluded in the letter that he was not sure what "cooperation" Griffin expected from USF & G. USF & G made clear that they would not agree to any additional liability.

Griffin responded to this letter by carefully delineating what measures of "cooperation" Ernest expected from USF & G. Griffin acknowledged his concern that Walter or its surety may seek to set off Ernest's claim against Walter's liability for delay damages. Griffin Affidavit, Exhibit C. Griffin then summarized his request for cooperation:

> In the very simplest terms possible, Ernest only asks that a method and means be worked out for securing to it whatever the obligations to it may be of the Government, through Walter. Ernest does not seek a Miller Act claim, for there is no existing obligation, at this time, on the part of anybody to Ernest. When and if the Government is determined to be liable to Ernest, Ernest simply seeks a means of recovering the amount the Government owes. The agreement that was presented to USF & G and to Walter for execution was my suggestion as to how this goal could be accomplished.

Griffin Affidavit, Exhibit C. Nevertheless, Trecker rejected Ernest's offer for "cooperation" and merely reaffirmed USF & G's earlier position: "It is our position that your client has not met the conditions precedent to recovery against USF & G under its Labor and Material Payment Bond. In addition, USF & G is not a party to any agreement(s) between your client and our Principal, Murray Walter, Inc." Griffin Affidavit, Exhibit D.

In June 1987, the Veterans Administration Board of Contract Appeals entered a final decision. Administrative Judge Pullara concluded that Ernest in fact had encountered a differing site condition, remanded the matter to the contracting officer for a decision on the amount due on the claim, and further held that Walter was entitled to an extension of only 30 days to pay liquidated damages.

Following that decision, Ernest's counsel contacted Lefter, Trecker, and Walter's counsel to meet and discuss Ernest's quantum claim prior to meeting with the board. Ernest Exhibit 19. Nathan Johnson, a contracting officer for the VA, responded to Ernest's request and stated that USF & G would not pay the liquidated damages since Walter was appealing Judge Pullara's decision. Johnson acknowledged that a meeting would be scheduled to consider Ernest's claim once a decision was rendered. Moreover, Johnson reminded Ernest's counsel that "any discussion on this subject must involve an authorized representative of Murray Walter, Inc. or United States Fidelity and Guaranty Company as the VA has no privity of contract with the Ernest Construction Company." Ernest Exhibit 16.

Ernest replied to Johnson's letter, expressing its intention to determine Ernest's quantum claim while the facts and documents were still recent. Johnson declined and reaffirmed his previous position, on the advice of government counsel, that a meeting would be scheduled once he received payment by USF & G of liquidated damages.

Seemingly unable to persuade the parties to consider Ernest's quantum claim, the parties consulted with Judge Pullara by conference call on April 7, 1988, and the VA agreed to postpone paying Ernest's quantum claim until Walter's appeal was concluded. Once Walter's appeal had been decided and the amount owed Ernest had been negotiated, the government agreed to then meet with Ernest and USF & G concerning the method by which Ernest would be paid on its claim. Ernest Exhibit 18. However, the VA and Ernest agreed to meet prior to a decision and negotiate Ernest's proposal concerning *quantum.*

Ernest submitted copies of the quantum entitlement as previously determined by Judge Pullara. Ernest Exhibit 19. The VA agreed to review that proposal and arrange a

meeting within 30 days. After submitting various dates and negotiating the location of the meeting, Walter Ernest, L. Ray Vinson, and Harry L. Griffin, Jr., met with governmental representatives on July 25, 1988, in Washington, D.C., to discuss settlement of Ernest's claim.[3] In August 1988, the parties met a second time in Columbus, Georgia, to further explore settlement possibilities. The VA reviewed cost records and other documentation concerning Ernest's claim, and upon conclusion of the meeting, offered to pay Ernest $425,000.00, exclusive of interest. Griffin Affidavit at 9.

Before formally accepting the VA's offer, Ernest's Counsel spoke with Luther Ott—Counsel for USF & G—who had requested a copy of the Liquidating Agreement between Walter and Ernest. Ernest's Counsel stated his legal position to Ott concerning payment of monies owed to Ernest. He told Ott that Ernest settled with the VA and that the settlement amount was payable under the liquidated agreement. Griffin Affidavit at 10. *See also* Griffin Affidavit, Exhibit E. On September 2, 1988, Ernest formally accepted the VA's settlement offer. Ernest Exhibit 21.[4]

Although Ernest claimed entitlement to the monies owed by the VA, USF & G once again took a contrary position. Counsel for USF & G contacted Barbara Lach, Assistant General Counsel for the Veterans Administration, concerning the payment of liquidated damages. Ernest Exhibit 23. Lach requested in a letter dated August 3, 1988, full payment of liquidated damages. USF & G declined and insisted that the VA exercise its statutory setoff against Ernest's differing site claim in favor of USF & G. USF & G stated its position in a letter dated August 30, 1988, which provides in pertinent part:

> USF & G sincerely believes that *it is entitled to the benefit of any additional amounts earned under the referenced contract, including sums paid with respect to the differing site condition claim.* USF & G is equitably subrogated to all rights of

its principal, Murray Walter, Inc., which was the prime contractor and is the only entity with whom the Veterans Administration contracted. Even more importantly, to the extent USF & G satisfies the liquidated damages assessment, USF & G is subrogated to the contract funds, whether arising from the differing site condition claim or otherwise.

Ernest Exhibit 23 (emphasis added).

On September 9, 1988, USF & G contacted Nathan Johnson and restated its position concerning liquidated damages. USF & G enclosed payment in the sum of $1,678,-651.91, which sum was arrived at by subtracting the settlement amount from the principal amount of $2,185,000.00. Ron Yarbrough, Counsel for USF & G, contacted Ernest concerning its claim against monies set off by USF & G. Ernest Exhibit 25. Ernest responded in a lengthy twenty-page letter, outlining Ernest's legal claims. Ernest Exhibit 26. Thereafter, although Barbara Lach believed that USF & G was trying to "hold them hostage" and strongly opposed accepting any setoff, Nathan Johnson accepted USF & G's partial payment. Ernest Exhibit 28.

Ernest vehemently protested the setoff of Ernest's claim. On November 3, 1988, Ernest demanded that USF & G pay the full amount of the differing site condition claim, $680,114.45, on or before November 14, 1988. Ernest Exhibit 29. Otherwise Ernest would consider its claim refused and would file suit. USF & G responded to Ernest's letter, stating that USF & G disagrees, but recognized that "there continues to be a legitimate, good-faith dispute between USF & G and Ernest." Ernest Exhibit 30.

USF & G filed an action in this Court on October 19, 1988, seeking declaratory relief. Shortly thereafter, Ernest filed suit on December 2, 1988, in the United States District Court for the Southern District of Alabama, setting forth various claims for relief, which

---

**3.** Walter's Vice-President, Davis Burrett, and Walter's Counsel, Leslie Hynes, appeared at the settlement meeting in the morning, but did not return after lunch. USF & G did not attend this meeting. Griffin's Affidavit at 9.

**4.** It is Ernest's belief that there is a settlement. This is, however, a disputed fact which cannot be resolved today.

include: (1) conversion of statutory trust; (2) conversion of an express trust; (3) breach of fiduciary duty; (4) breach of contract; (5) tortious interference with contract; (6) unjust enrichment; (7) conversion of a constructive trust; (8) equitable lien; (9) restitution; (10) quantum meruit; and (11) punitive damages.[5]

On February 16, 1989, Judge Hand of the Southern District of Alabama granted USF & G's Motion to Transfer the Case to the United States District Court for the Middle District of Florida, Tampa Division, to be consolidated with the earlier filed case by USF & G, Case No. 88–1633–Civ–T–15(B).

## B.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see, e.g., Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 607 (11th Cir.1991). A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2554. The Federal Rules permit the moving party to discharge its burden with or without affidavits and to move for summary judgment on the case as a whole or on any claim. *Id.*

When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interroga-

tories, and admissions on file," designate specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman*, 873 F.2d 256 (11th Cir.1989); *Samples on behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988). The Eleventh Circuit has explained the reasonableness standard:

> In deciding whether an inference is reasonable, the Court must 'cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness.' (citation omitted). The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.

*WSB–TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir.1988).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the Court should not grant the summary judgment motion. *Augusta Iron and Steel Works, Inc. v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir.1988) (per curiam). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

---

**5.** On February 6, 1992, Ernest filed a Motion for Leave to Amend the Complaint and Counterclaim (Doc. No. 70). While that motion shall be considered in this order, the additional claim to

be added—a claim pursuant to the Miller Act on the performance bond—is not presently before the Court.

must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512.

## C.

### ANALYSIS

This case involves a subcontractor's priority claim of entitlement to certain funds owed by the United States Veterans Administration to Ernest for a differing site condition, but retained by the prime contractor's surety, USF & G, as a setoff. Because the cross-motions for summary judgment present different issues, the Court shall consider each party's motion separately.

### I.

### USF & G'S MOTION FOR SUMMARY JUDGMENT

USF & G asserts that it is entitled to summary judgment on two grounds: (1) USF & G is not liable to Ernest on USF & G's payment bond if Ernest never brought suit against USF & G within the time required by 40 U.S.C. § 270b; and (2) should the Court determine that USF & G is liable, USF & G contends that USF & G has priority ahead of Ernest to monies owed by the VA to its principal Walter because USF & G has paid liquidated damages resulting from Walter's lateness in completing the Bay Pines project. By paying delay damages, USF & G claims that it is subrogated to the government's right to set off funds owed to Walter on Ernest's differing site claim.

The issue presented for resolution is whether a surety, which pays liquidated damages on behalf of a contractor and claims priority to a subcontractor's "pass through" differing site claim, may be subrogated to the government's right to set off the subcontractor's differing site claim against the contractor when the subcontractor remains unpaid?

### 1.

### PAYMENT BOND

 It is a well-settled principle that " 'laborers and materialmen do not have enforceable rights against the United States for their compensation.' " *United States Fidelity & Guar. Co. v. United States,* 201 Ct.Cl. 1, 475 F.2d 1377, 1381 (1973) (citation omitted).

Laborers and materialmen do not acquire liens on property belonging to the United States. Instead, materialmen may seek compensation when the prime contractor fails to meet its obligations by filing a claim under the Miller Act. The Miller Act provides in pertinent part:

(a) Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under sections 270a to 270d of this title ... shall have the right to sue on such payment bond....

(b) Every suit instituted under this section shall be brought in the name of the United States for the use of the person suing, in the United States District Court for any district in which the contract was to be performed and executed and not elsewhere, irrespective of the amount in controversy in such suit, but no such suit shall be commenced after the expiration of one year after the day on which the last of the labor was performed or material was supplied by him. The United States shall not be liable for the payment of any costs or expenses of any such suit.

40 U.S.C. § 270b.

Thus, a payment bond guarantees that subcontractors, laborers, and materialmen will be paid in the event of the principal's default. As one court noted, " '[a] payment bond ... protects the subcontractors, the materialmen, and the laborers.... They look first to the prime contractor for payment. If, however, the prime contractor fails to pay any of them, then the surety is obligated to pay them.' " *Aetna Casualty & Sur. Co. v. United States,* 845 F.2d 971, 973 (Fed.Cir.1988) (citation omitted).

 By filing a declaratory action, USF & G seeks the Court's declaration of its liability to Ernest on the payment bond. USF & G contends that it is not liable to Ernest for retaining funds owed to Walter on Ernest's differing site claim because the time to file a payment bond claim has expired. During oral argument, Ernest conceded the point as the following colloquy ensued:

**Mr. Griffin:** And let me talk first about this big distinction made between payment bonds and performance bonds.

**The Court:**—you've got money that Walter was supposed to give us, and you owe us that money.

**Mr. Griffin:** That's our case, that's our case. I want to talk about the payment bond case because I guess you've got to deal with this, Your Honor. You can't quite stop where—

**The Court:** That would be easy.

Transcript of Summary Judgment Hearing at 51.

Ernest's legal theories asserted in this matter are not derivative of the payment bond. To the contrary, the theories asserted by Ernest are entirely state law causes of action, including equitable claims for relief. The Court concludes, therefore, that there is no factual dispute concerning Ernest's noncompliance with the Miller Act. Moreover, Ernest admits to not filing a timely claim, although Ernest contends that such a claim—had it been timely filed—would have been dismissed as premature.

Nonetheless, the one year statute of limitations for filing such a claim against the payment bond expired on September 29, 1980 (the last day Ernest performed work on the project); therefore, USF & G is entitled to summary judgment on that issue.[6] *See* Transcript of Summary Judgment Hearing at 19.

### 2.
### PRIORITY OF FUNDS

 USF & G contends that it may avail itself of the benefit of a setoff which reduced USF & G's performance bond liability to the VA for liquidated damages—even though Ernest, a subcontractor, has not been paid on its differing site claim. USF & G claims priority to Ernest's differing site claim because USF & G became subrogated to the government's right of setoff upon partially paying liquidated damages owed by the prime contractor Walter. Although Ernest

could have avoided this setoff by filing a claim on the payment bond and thereby ensuring payment of its claim, USF & G argues that Ernest failed to file a timely action on the payment bond, which failure prohibits Ernest from asserting any claims; the payment bond is Ernest's sole remedy. *A fortiori*, USF & G then argues that all of Ernest's rights against USF & G were extinguished, which further elevates USF & G's priority to funds owed by the VA on Ernest's claim and allows USF & G to exercise a setoff without impunity. The Court does not agree.

#### a. AVAILABILITY OF STATE LAW REMEDIES

 The Miller Act provides materialmen certain rights against a contractor and a surety. These are not the *only* rights that one can assert, however. "Nothing in the Miller Act or in its legislative history suggests that Congress intended the Act to protect sureties from liability for torts or other violations of state laws or regulations that they may commit in connection with payment bonds executed pursuant to the Act." *K–W Industries v. Nat'l Sur. Corp.*, 855 F.2d 640, 642 n. 3 (9th Cir.1988) (permitting Plaintiff to assert an unfair insurance claim pursuant to Montana's state law). Moreover, a surety's liability based on a payment bond is " 'separate from and independent of any *in personam* right … which the supplier may have against the owner, a contractor, or a subcontractor, by way of a contract or otherwise.' " *Id.* at 643 (citation omitted). Ernest is procedurally foreclosed from asserting a claim on the payment bond, but not foreclosed from asserting state-law claims, such as a claim for breach of contract or other equitable remedies that Florida courts would permit a materialman to assert. *Id.* at 643.

#### b. MATERIALMEN HAVE PRIORITY

Prior to the Supreme Court's decision in *United States v. Munsey Trust Co.*, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947), the

---

**6.** This does not, however, foreclose Ernest's claim for relief on the performance bond. Although Ernest's Complaint does not include a claim for relief on the performance bond, there is

a motion pending to amend the complaint, which is considered *infra*. *See United States v. Pitt General Contractors, Inc.*, 769 F.Supp. 1016 (E.D.Tenn.1991).

United States' right to set off claims was firmly established. *McKnight v. United States,* 98 U.S. 179, 186, 25 L.Ed. 115 (1879). It was also an established doctrine that a surety that either completes a contract or pays materialmen is entitled to funds retained by the government. *Henningsen v. United States Fidelity & Guar. Co.,* 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908); *Prairie State Bank v. United States,* 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896). Yet a different issue arose in *Munsey* concerning two competing claims to funds retained by the government upon a contractor's default: (1) whether the government may exercise its right of setoff; and (2) whether the surety claiming equitable subrogation to the retainage could defeat the government's right to set off the retainage against the appointed receiver.

In *Munsey,* the Federal Contracting Corporation ("FCC") entered into six contracts with the government to paint and repair certain federal buildings. The contractor completed the work, but failed to pay materialmen. As required by the payment bond, Aetna paid the materialmen $13,065.93. The government accepted the work and retained monies previously deducted from progress payments, which amounted to $12,445.03.

The FCC also submitted a bid on a second contract, which the government accepted. FCC later failed to perform as promised. As a result, another contractor was hired to complete the job, resulting in damages to the government in the amount of $6,731.50. Although FCC defaulted under the second contract, a stockholder of FCC asked the court to collect from the government the monies retained on the first contract. When the receiver demanded the monies retained, the government deducted their damages ($6,731.50) and paid to Aetna the remainder. Aetna protested the government's setoff, asserting its right to the full amount of the remainder ($12,445.03).

The Supreme Court considered the receiver's claim that since Aetna compensated unpaid materialmen as obligated by the payment bond, Aetna became subrogated to not only the rights of laborers and materialmen but also to the rights of the *United States.*

First, the Court noted that "the government has the same right 'which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him.'" *Id.,* 332 U.S. at 239, 67 S.Ct. at 1602 (citation omitted). The Court noted that "[i]f the right of the United States to make the set-off were opposed only by the claims of the contractor, this case would present no difficulty." *Id.* at 239, 67 S.Ct. at 1602. Clearly, the government could exercise a setoff against FCC, a creditor but which owed monies for failure to complete the second contract.

Trying to avoid the setoff, the surety in *Munsey* contended that it was subrogated to the rights of the materialmen as well as the United States. If the surety were subrogated to the United States as alleged, then the surety would have priority to the retainage and the government would be prohibited from exercising its right of setoff. The Supreme Court rejected that unfounded assertion. The Court reasoned that in *Prairie State Bank* and its progeny, the owner was merely a stakeowner lacking any rights of its own to assert. As such, the United States had no interest in the funds, and upon paying either the materialmen or completing the performance of the contract, the surety acquired the same rights as the United States to the funds; the surety was then subrogated to the United States.

Continuing its analysis, the Court recognized the surety's obtuse reasoning in attempting to recover the retainage, which is analogous to the case at bar. The Court stated that "[o]ne who rests on subrogation stands in the place of one whose claim he has paid, as if the payment giving rise to the subrogation had not been made." *Id.* at 242, 67 S.Ct. at 1603. As such, once materialmen are paid they no longer have any rights in the fund; their rights in the fund are extinguished. Similarly, a surety cannot acquire by subrogation (standing in the materialmen's shoes) rights which the materialmen themselves do not possess. Materialmen do not have enforceable rights against the United States for their compensation. *Id.* at 241, 67 S.Ct. at 1602. Nor can they acquire a lien on public buildings. It is precisely because

materialmen lack effective remedies against the government that Congress enacted the Miller Act. To allow otherwise would lead to an anomalous result—a surety through subrogation would possess greater rights than either a contractor or a materialman whose rights the surety asserts.

If a materialman is *not* paid for labor supplied, the surety cannot claim subrogation to its rights since by definition the surety has done nothing to earn subrogation. The Court poignantly concluded that "[h]e cannot jump back and forth in time and present himself at once as the unpaid claimant and again, under the conditions as they have changed, because payment was made." *Id.* Hence the Court determined that a surety is "subrogated to the rights of laborers and materialmen who might have superior equitable rights to the retainage" but have no right to enforce their priority against the United States. *Id.*

The Supreme Court left unresolved, however, a materialman's right to a retainage if the contractor and surety failed to pay him. The Court shall return to this unresolved issue, which is the penultimate issue presented in this litigation, following a brief discussion of two other important decisions.

The Supreme Court again considered a dispute to a retainage held by the government in *Pearlman v. Reliance Insurance Company*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). Unlike the situation in *Munsey*, the contractor had filed for bankruptcy, and the dispute over the retainage was between the debtor contractor's Trustee and Reliance Insurance Company, the payment bond surety. At issue was the priority to the retainage.

In *Pearlman*, Dutcher Construction Company ("Dutcher") contracted with the United States to perform work on the St. Lawrence Seaway project. Before completing the work, Dutcher experienced financial trouble causing the United States to terminate the

contract. Because Dutcher had failed to pay laborers and materialmen, Reliance paid $350,000 to discharge the contractor's debts. The surety then claimed entitlement to the funds withheld from the contractor's progress payments, which amounted to $87,737.35. The Trustee claimed the retained funds became property of the estate, in which the Trustee's rights were superior.

The *Pearlman* Court reaffirmed its holding in *Munsey* but narrowly defined the doctrine as allowing the government to exercise the common-law right of debtors to set off claims against creditors. In addition to adhering to *Munsey*, the Court reaffirmed the prior doctrines established in *Prairie State Bank v. United States*, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896), and *Henningsen v. United States Fidelity & Guar. Co.*, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908), and held that upon paying laborers and materialmen, the surety earned entitlement to the benefit of all rights necessary to reimburse it, including the retained funds. In arriving at this holding, the Court determined that the government possessed no rights of its own to assert, which made *Pearlman* factually distinguishable from *Munsey* but similar to *Henningsen*.

■ These two landmark decisions establish certain principles which are instructive in resolving the present issue. *Munsey* has come to stand for the proposition that "[w]hoever, be it the contractor or his surety, pays the laborers and the materialmen would be a creditor of the government insofaras the retained funds are concerned." *Trinity Universal Ins. Co. v. United States*, 382 F.2d 317, 321 (5th Cir.1967), *cert. denied*, 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 873 (1968). Yet the government has a right to set off claims against its creditors, including the surety who is subrogated to those rights. *See, e.g., Centron Corp. v. United States*, 218 Ct.Cl. 1, 585 F.2d 982 (1978).[7] The doctrine announced in *Munsey* entitles the government, as a general rule, to exercise a setoff; and

---

7. USF & G argues that *Centron Corporation v. United States*, 218 Ct.Cl. 1, 585 F.2d 982 (1978), provides a basis for its alleged right of setoff. This case is distinguishable because the party claiming entitlement to the funds in *Centron* was merely an assignee of the general creditor Elegant. In this case, Ernest is an unpaid *materialman* with rights that it can assert. The *Centron* rational is, therefore, consistent with *Munsey*, but it does not provide a basis for USF & G to claim a right of equitable subrogation.

when the government is more than a mere stakeholder having rights of its own to assert, a surety is precluded from claiming subrogation to the government's rights and thereby avoiding the setoff.

■ *Pearlman* instructs that upon paying laborers and materialmen or completing performance of the contract, the surety earns entitlement to the benefit of all rights necessary to reimburse it, including the retained funds, provided the government has *no* rights of its own to assert. *See United States Fidelity & Guar. Co. v. United States,* 201 Ct.Cl. 1, 475 F.2d 1377, 1382 (1973) (rejecting the inference from *Pearlman* that if subcontractors have rights to which the surety may be subrogated, then the subcontractors should be able to assert their rights directly against the government). From these decisions, it is clear that USF & G cannot claim subrogation to the government's rights. Hence the Court will consider a third approach.

Some courts have developed an approach which modifies the *Munsey* doctrine. This pragmatic approach distinguishes between a surety's rights under the payment and performance bond. *Aetna Casualty & Sur. Co. v. United States,* 845 F.2d 971, 974 (Fed.Cir. 1988). Although the *Munsey* doctrine prevents a surety or claimant from being subrogated to the government when the government has a right to assert, in certain instances courts have allowed a surety to be subrogated to the government nonetheless.

In *Security Ins. Co. v. United States,* 192 Ct.Cl. 754, 428 F.2d 838, 841 (1970), the court followed the Supreme Court's reasoning in *Munsey,* and considered whether the government may set off taxes owed by a defaulting contractor against retainages claimed by a surety which completed performance of the project. The court held in *Security Insurance* that the surety could recover the retainage free from setoff, and in doing so, refined *Munsey*'s application to cases involving a payment bond surety.

The court hypothesized that the Supreme Court recognized this crucial distinction in *Munsey. Id.* at 843. Quoting *Munsey,* the court stated in relevant part:

Respondent [surety] argues that if the work had not been completed, and the surety chose not to complete it, the surety would be liable only for the amount necessary to complete, less the retained money. Moreover, if the surety did complete the job, it would be entitled to the retained moneys in addition to progress payments. The situation here is said to be similar. But when a job is incomplete, the government must expend funds to get the work done, and is entitled to claim damages only in the amount of the excess which it pays for the job over what it would have paid had the contractor not defaulted. Therefore a surety would rarely undertake to complete a job if it incurred the risk that by completing it might lose more than if it had allowed the government to proceed. When laborers and materialmen, however, are unpaid and the work is complete, the government suffers no damage. The work has been done at the contract price. The government cannot suffer damage because it is under no legal obligation to pay the laborers and materialmen. In the case of the laborers' bond, the surety has promised that they will be paid, not as in the case of performance bond, that work will be done at a certain price.

*Id.* at 841–42. The rational for this distinction is pragmatic; namely, that a surety electing to complete performance would confer a benefit on the government by relieving it of the task of completing performance itself. A performing surety occupies this preferred position because it has an equitable right of subrogation to the government's funds.

In this case, USF & G claims priority to Ernest's differing site claim because USF & G allegedly became subrogated to the government upon paying liquidated damages owed by Walter. In order to prevail on this claim, USF & G must establish: (1) a theory for being subrogated to the government, which would establish the surety's entitlement to the funds owed to Ernest on the differing site claim; and (2) should the surety be subrogated to the funds, the surety must also have *priority* over subcontractor Ernest.

■ The *Pearlman* doctrine does not establish USF & G's entitlement to the funds because the government is more than a mere stakeholder, possessing rights of its own to assert. The contractor has failed to pay Ernest, which is the reason for this litigation. Nor has that obligation been discharged by USF & G. Thus, the monies claimed by Ernest are not being held for the benefit of a creditor who discharged the government's liability.

Second, the modified *Munsey* doctrine does not apply since USF & G did not complete performance of the contract, albeit USF & G did pay delay damages. The contracting officer agreed in May 1980 to refrain from withholding liquidated damages incurred by Walter. The *quid pro quo* for not exercising the setoff was USF & G's promise to pay all liquidated damages. This arrangement prevented either the surety or the government from having to hire a new contractor and complete the project. Nevertheless, paying delay damages does not allow a surety to be subrogated to the governments rights.[8]

Last, the *Munsey* doctrine does not establish USF & G's priority to the funds vis-a-vis the government, though it certainly establishes the government's right to set off monies owed to a defaulting contractor so long as a condition precedent is satisfied: all materialmen and laborers who have asserted claims have been paid. *Munsey* made clear that the government could exercise a setoff against a contractor and defeat a surety's claim of priority because the materialmen and laborers had been paid, and asserting the setoff in that instance would not injure materialmen and laborers.

Hence the Supreme Court recognized that other situations might develop in which materialmen might be unpaid and a setoff would be improper. The Supreme Court stated:

We need not decide whether laborers and materialmen would have any claim to the retained percentages if both contractor and surety failed to pay them. Even if

they do, certainly those would be rights to which the surety could not be subrogated, for by hypothesis it would have done nothing to earn subrogation.

*Id.,* 332 U.S. at 242, 67 S.Ct. at 1603. Although the Supreme Court left the question unresolved, the court of claims has repeatedly expounded on this language and acknowledged such a right by a *subcontractor.*

In *Nat'l Sur. Corp. v. United States,* 132 Ct.Cl. 724, 133 F.Supp. 381 (1955), *cert. denied sub nom. First Nat'l Bank v. United States,* 350 U.S. 902, 76 S.Ct. 181, 100 L.Ed. 793 (1955), the court decided a dispute between surety companies on a defaulting contractor's payment bonds and a bank which sued under an assignment. The *National Surety* court held in favor of the sureties. The court's holding imposes an equitable obligation on the government to see that laborers and materialmen are paid prior to general creditors. The reason for imposing this equitable obligation is that it would be "unfair to allow general creditors priority when their services did not contribute to the performance of the contract, when those who did remain unpaid." *In re Dutcher Constr. Corp.,* 378 F.2d 866, 870 (2nd Cir.1967).

To discharge this equitable obligation, Congress passed the Miller Act, requiring a contractor to obtain certain bonds payable to the United States. Through these bonds, a contractor's surety guarantees that laborers and materialmen will be paid. Upon payment, the government's equitable obligation to them terminates. Unless the government first discharges this equitable obligation, the obligation continues into the future and must be satisfied before paying another who might claim entitlement by setoff or otherwise.

■ Thus, if a contractor fails to pay a materialman, the United States has an equitable obligation to use the money due him to pay the subcontractor. *Nat'l Sur. Corp.* 133 F.Supp. at 384. As one court observed, "it would be inequitable for the United States to retain the benefits of what the laborers and materialmen had done for it and pay to

---

8. Even assuming that it did allow the surety to be subrogated to the government's rights, the surety would then be charged with the subrogee's liabilities. *Occidental Ins. Co. v. Herman,* 179 Misc. 499, 38 N.Y.S.2d 278 (Spec.Term.Sup.Ct.1942). As such, the surety would assume the government's equitable obligation to pay the subcontractor. The result would be the same.

someone else money which the contractor should have paid to them." *Id.* A subcontractor's equitable right to monies owed by the government precludes the government from exercising a setoff, which ordinarily the government may exercise as the Court held in *Munsey,* when a materialman pressing a claim remains unpaid.

The approach adopted by this Court today establishes a materialman's priority to funds claimed either by the government or a performing surety. In summary, the Court recognizes that although a surety's legal obligation to pay pursuant to the bond may lapse upon the expiration of the statute of limitations, as USF & G contends here, the *equitable* obligation continues even though USF & G has no *legal* duty to do so. While *Munsey* ordinarily allows the government to set off claims against a contractor and defeat any claims by a surety, *Munsey*—as applied by the court of claims in *National Surety*—does permit a materialman to assert an equitable lien against the holder of the monies or benefit, including the government. Hence the government, which otherwise could set off against a creditor such as Walter, is precluded from doing so when a materialman is unpaid and asserts priority to retained funds. The exception to this rule would be, as noted *supra,* if a surety completes performance of the contact and compensates any unpaid materialmen. In that instance, the government no longer has any rights to assert, either equitable rights to see that a subcontractor is paid or a right to setoff against creditors. The government's claims are satisfied reducing the government to a mere stakeholder as in *Pearlman.*

■ Clearly, then, Ernest has priority to the funds retained by USF & G as a result of the setoff. While the Court has concluded that USF & G cannot claim subrogation to the government's rights and that Ernest has priority over both the surety and the government, the question arises, as it did in *Munsey,* whether Ernest has a right to complain or simply whether Ernest has an equitable lien but lacks standing to enforce the lien. To be sure, the Supreme Court stated in *Munsey* that:

[w]hen laborers and materialmen, however, are unpaid and the work is complete, the government suffers no damage. The work has been done at the contract price. The government cannot suffer damage because it is under no *legal* obligation to pay the laborers and materialmen. In the case of the laborers' bond, the surety has promised that they will be paid, not as in the case of performance bond, that work will be done at a certain price.

*Munsey,* 332 U.S. at 244, 67 S.Ct. at 1604 (emphasis added). Ernest cannot pursue a legal claim against the government with whom it lacks privity. Chancery, however, does provide a subcontractor with an equitable remedy. Similarly, it appears that Florida courts of chancery would also impose an equitable lien on retained funds when a materialman has been unpaid and asserts a valid claim. *Crane Co. v. Fine,* 221 So.2d 145 (Fla.1969); *Peninsular Supply Co. v. C.B. Day Realty, Inc.,* 423 So.2d 500 (3rd DCA 1982). Such a result is consistent with *Munsey* and its progeny.

## II.

## ERNEST'S SUMMARY JUDGMENT MOTION

Ernest has moved for summary judgment on Counts One through Four and Counts Six through Ten of the Complaint, which consist of the following claims: (1) civil conversion; (2) statutory trust; (3) express trust; (4) unjust enrichment; (5) constructive trust; (6) resulting trust; (7) equitable lien; and (8) priority to the funds.

Essentially, Ernest argues that USF & G has misappropriated the corpus of a trust—either statutory, express, or constructive—by refusing to surrender upon demand the amount owed by the government to Ernest for the differing site claim. The remaining claims are alternative theories for recovery which seek chancery's imposition of an equitable lien or priority to the funds to avoid unjust enrichment. The latter claim has been decided *supra.* The Court will consider each of the remaining claims in turn.

### a. STATUTORY TRUST

██ Ernest contends that Florida law creates a statutory trust on the funds owed by the government to Ernest on its differing site condition claim. The applicable statute provides that:

> [a]ny contractor, subcontractor, or sub-subcontractor who receives funds which are owed by that person directly to a subcontractor, sub-subcontractor, materialman, or other lienor under this part shall hold such funds in trust for such subcontractor, sub-subcontractor, materialman, or other lienor and shall not use such funds for any other purpose.

Fla.Stat.Ann. 713.347 (West 1988). This statute was repealed in 1988, but it was in effect when the government granted USF & G a credit in its letter dated September 19, 1988. In order for this statute to apply, the plain language imposes a requirement that the person receiving the funds be a contractor, a subcontractor, or a sub-subcontractor.

The statute defines a contractor as:

> a person other than a materialman or laborer who enters into a contract with the owner of real property for improving it, or who takes over from a contractor as above defined the entire remaining work under such contract.

*Id.* at 713.01(2). This statutory definition does not, however, specifically define contractor to include a surety, although it could apply to a surety in at least one circumstance. For example, it could apply when a surety asserts a claim on behalf of a contractor. In that instance, when a surety is subrogated to the rights of the contractor, the surety would be subject to any liabilities of the contractor. So, if a contractor misappropriated funds owed to a materialman and a surety subrogated to a contractor's rights asserted those rights, the surety could be liable to the materialman for the *contractor's* unlawful conversion.

In this case, USF & G is not asserting the contractor's rights for which it may be liable.[9] Yet Ernest asks the Court to expand the statute's definition, which would impose a statutory trust on funds retained by a surety. In this diversity case, the Court is bound by Florida substantive law and must decide the case as if a Florida state court were confronted with this issue. By the plain meaning of the statute, a statutory trust is imposed on funds that are: (1) received; and (2) by a contractor. *Accord Carey Lumber Co. v. Bell,* 615 F.2d 370 (5th Cir.1980) (holding that a trust is created when the *contractor* receives the funds). As such, the Court relying on the statute's plain meaning does not believe that Florida would expand the statue's definition to include sureties and declines to do so today. Thus, the Court concludes that Ernest has failed to meet its burden and is not entitled to summary judgment on its claim to impose a statutory trust.

### b. EXPRESS TRUST

██ Ernest asserts that the liquidated agreement between Walter and Ernest creates an express trust. An express trust can be created and proved by parol evidence, *Bailey v. Baron,* 269 So.2d 45, 47 (3rd DCA 1972), although courts have been cautious in recognizing trusts created entirely by parol. In order to create a trust, there must be sufficient words to create it; there must be evidence of intent. *Id. Accord Federal Ins. Co. v. Fifth Third Bank,* 867 F.2d 330, 333 (6th Cir.1989).

If Ernest were suing the contractor who retained monies owed to it, the Court would agree that Ernest has a cognizable claim since Walter was a party to the agreement, providing that the agreement, as a factual matter, demonstrated the requisite intent to create a trust. Thus, if the Court were to find that the liquidated agreement also created an express trust, this trust agreement would be binding against the contractor Walter. The surety USF & G is not, however, a party to the liquidated agreement.

For Ernest to prevail on this claim against the *surety,* Ernest must first demonstrate that USF & G is bound by the liquidated

---

9. As the Supreme Court reasoned in *Munsey, supra,* the Court will not allow USF & G to stand in the contractor's shoes for one purpose while standing in the government's shoes for another purpose. USF & G's position has been that its right to set off funds owed to Ernest is derived from subrogation to the *government's* rights.

agreement which itself contains an express trust. Such *ratification* is critical to Ernest's claim. Without ratification, the surety cannot be liable for a trust created by a contractor and a materialman to which USF & G is not a party. In addition, even if USF & G were asserting Walter's rights, the surety would be liable only if the contractor were liable. The contractor did not receive any funds and, as USF & G correctly argues, the Court would have to stretch the definition of "received" to include a setoff.

Nonetheless, if USF & G ratified the liquidated agreement and if USF & G was unauthorized to set off funds owed to Walter on Ernest's differing site claim, then USF & G may be liable for conversion of an express trust. This question concerning USF & G's ratification of the agreement is a factual question which cannot be resolved on summary judgment. In fact, Ernest conceded this point in its Opposition to USF & G's Summary Judgment Motion. The Court concludes, therefore, that Ernest has failed to meet its burden on summary judgment.

### c. CONSTRUCTIVE TRUST

 In the alternative, Ernest argues in favor of a constructive trust. Under Florida law, a constructive trust is imposed in equity when:

> property which has been acquired by fraud, or where, though *acquired originally without fraud, it is against equity that it should be retained by him who holds it* ... [E]quity will raise a constructive trust and compel restoration, where one through actual fraud, abuse of confidence reposed or accepted, *or through other questionable means* gains something for himself which in equity and good conscience he should not be permitted to hold.

*American Nat'l Bank v. FDIC,* 710 F.2d 1528, 1541 (11th Cir.1983). *See also Barnett Bank of Tallahassee v. Applegate,* 379 So.2d 1284, 1287 (1st DCA 1978); *Reaves v. Hembree,* 330 So.2d 747, 749 (1st DCA 1976), *cert. denied,* 345 So.2d 423 (Fla.1977). Ordinarily, a constructive trust is imposed to prevent unjust enrichment of the more culpable party. In this case, USF & G agreed to assume the risk of certain losses. By issuing a performance bond and a payment bond, USF & G assumed the risk of completing the project should the contractor default; USF & G assumed the risk of paying materialmen if the contractor failed in its obligations. The parties who are not at risk are the materialmen and laborers and the owner.

When USF & G realized that the contractor Walter could not complete the project on time, USF & G negotiated with the VA to minimize the damage. As part of that plan, USF & G has tried to obtain the monetary advantage of a successful claim brought by Ernest through Walter, while avoiding payment to Ernest for work performed on the project. If Ernest had quit working upon discovering the differing site condition, the surety would have been responsible for completing the unfinished work. By continuing work on the foundation in light of the difficulties, Ernest more than likely saved USF & G money. Yet USF & G demanded that the VA exercise a set off in its favor and diverted those funds to USF & G's benefit. This rationale is questionable at best.

During the hearing on the motion for summary judgment, USF & G repeatedly badgered Ernest for failing to file an action on the payment bond. Ernest did not so file because counsel felt the motion was premature. There is another reason as well. The construction business is much like any other business. Reputation and dependability (as well as price) ordinarily determine whether a subcontractor will be hired by a contractor on future jobs. If Ernest were to sue Walter which was experiencing financial difficulties, Ernest would have jeopardized future business, not only with the present contractor but also with other contractors. Simply put, what contractor would want to hire a subcontractor who becomes overwrought at the first sign of trouble and either fails to complete the project or sues the contractor? Ernest attempted to amicably resolve this matter; USF & G sought to take advantage of the opportunity.

Since the Court has determined that Ernest has *priority* to the funds being retained by USF & G on the differing site claim, the Court finds that Florida courts of chancery would create a constructive trust on Ernest's behalf. The Court finds, therefore, that Er-

nest has met its burden on summary judgment on the constructive trust claim.

### d. RESULTING TRUST

Ernest claims that a resulting trust was created even if the others fail. A resulting trust arises in three situations: (1) where an express trust fails in whole or in part; (2) where an express trust is fully performed without exhausting the trust estate; and (3) where a person furnished the money to purchase property in the name of another, with both parties intending at the time that the legal title be held by the named grantee for the benefit of the unnamed purchaser of the property. *Steinhardt v. Steinhardt,* 445 So.2d 352 (Fla. 3rd DCA 1984).

Ernest must first establish an *express* trust which failed in whole or in part. The Court has already concluded that it is unclear whether an express trust was created. As such, Ernest cannot meet its burden on summary judgment and this issue is reserved for trial.

### e. CIVIL CONVERSION

Since the Court has concluded that Ernest has priority to the funds owed on the differing site claim and that chancery imposes a constructive trust on those funds, the Court must now consider Ernest's claim that USF & G is liable for civil conversion of the trust.

Conversion is defined "as an act of dominion wrongfully asserted over another's property inconsistent with his ownership of it." *Belford Trucking Co. v. Zagar,* 243 So.2d 646, 648 (Fla. 4th DCA 1970). *Compare Dawkins v. Nat'l Liberty Life Ins. Co.,* 263 F.Supp. 119 (D.C.S.C.1967) (holding that breach of an obligation to pay money may not serve as the basis for a conversion action).

In order to be liable for conversion, there must be a specific and affirmative obligation by USF & G to deliver the monies to Ernest. *Id.* Simply because the Court has concluded that chancery imposes an equitable lien on the funds does not necessarily mean that the parties—by the liquidated agreement—imposed such an affirmative obligation. Thus, the existence of an obligation by USF & G to pay Ernest depends on whether USF & G ratified the agreement, which the Court concluded, *supra,* is an unresolved factual question. The Court does not reach, therefore, the merits of the civil conversion question. Instead, the Court concludes that Ernest has not met its burden on summary judgment.

In addition, the Court has imposed— through equity—a constructive trust on the funds owed by the government to Walter on its differing site claim. Though Ernest has priority to the funds, it is a separate question whether USF & G's actions were wrongful or unauthorized. As such, the Court concludes that Ernest has not met its burden and reserves this issue for trial.

### f. CHANCERY'S IMPOSITION OF AN EQUITABLE LIEN

The Court has already considered this claim in addressing Ernest's priority to the funds retained by USF & G from the setoff. *See* Section I. Thus, the Court's previous findings are dispositive of this claim and incorporated here. The Court concludes, as it previously held, that chancery imposes an equitable lien against the monies retained by USF & G due to the differing site claim.

Accordingly, it is **ORDERED AND ADJUDGED** that:

1. United States Fidelity & Guaranty's Motion for Summary Judgment (Doc. No. 45) in Case No. 88–1633–Civ–T–99 is **DENIED.** The Court finds that Ernest has priority to funds retained by USF & G on the differing site claim filed by Walter on Ernest's behalf. In addition, Ernest possesses an equitable lien in the amount of $680,114.15.

2. Ernest Construction Company's Motion for Summary Judgment (Doc. No. 48) in Case No. 88–239–Civ–T–99 is **GRANTED IN PART AND DENIED IN PART.** Summary judgment is granted in favor of Ernest Construction Company and against USF & G to the following extent: Ernest is entitled to a constructive trust on the funds retained by USF & G on the differing site claim filed by Walter on Ernest's behalf. In all other respects, the motion is **DENIED.**

3. The remaining state law issues shall be resolved during trial. The case shall be

scheduled by order entered under separate cover.

4. Ernest's Motion to Amend the Complaint is **GRANTED**. The clerk is directed to file the Amended Complaint.

5. The clerk is directed to reassign these cases to the Honorable Susan C. Bucklew for all further proceedings.

**DONE AND ORDERED.**